UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                           :
                                                 :        Chapter 15
SUNTECH POWER HOLDINGS CO., LTD.,                :        Case No.: 14-10383(SMB)
                                                 :
            Debtor in Foreign Proceeding.        :
----------------------------------------------------------------X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING
PETITION FOR RECOGNITION AS FOREIGN MAIN PROCEEDING
AND DENYING CROSS-MOTION TO CHANGE VENUE**

**A P P E A R A N C E S :**

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

          Peter Friedman, Esq.
          Daniel Shamah, Esq.
          Matthew Kremer, Esq.
          Suzanne Uhland, Esq.
          Jennifer Taylor, Esq.
               Of Counsel

*Attorneys for Petitioner*

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017

          John A. Morris, Esq.
          Debra I. Grassgreen, Esq.
          Jason H. Rosell, Esq.
               Of Counsel

          - and –

WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, California 90071

          W. Gordon Dobie, Esq.
          Eric E. Sagerman, Esq.
          Justin E. Rawlins, Esq.
          William C. O'Neil, Esq.
               Of Counsel

*Attorneys for the Solyndra Residual Trust*

**STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

Suntech Power Holdings Co. Ltd. (the "Debtor") is a debtor in a provisional liquidation pending in the Cayman Islands (the "Foreign Proceeding"). David Walker and Ian Stokoe, the Joint Provisional Liquidators, or JPLs, filed a petition under chapter 15 of the Bankruptcy Code seeking recognition of the Foreign Proceeding as a foreign main proceeding. *See* 11 U.S.C. § 1502(4), or alternatively, as a foreign nonmain proceeding. *See* 11 U.S.C. § 1502(5). Solyndra Residual Trust ("Solyndra") opposes recognition, and has filed a cross-motion to transfer the venue of the chapter 15 case to the Northern District of California. The dispute regarding recognition centers on three issues: (1) is the Debtor eligible to be a debtor under Bankruptcy Code § 109(a); (2) is venue proper in this district under 28 U.S.C. § 1410; and (3) is the Cayman Islands the Debtor's center of main interests ("COMI")? Depending on the answers to these questions, Solyndra seeks to transfer venue in the interests of justice or for the convenience of the parties. *See* 28 U.S.C. § 1412.

Solyndra's opposition to recognition as well as the support for its cross-motion are based on a mistaken assumption and allegations involving bad faith manipulation of the case. It maintains that the Debtor did business in San Francisco at the time the JPLs filed the chapter 15 case and the JPLs should have filed it there. Solyndra charges that the JPLs manipulated the venue of the case by establishing a New York bank account in order to file the case in New York. It also charges that the JPLs manipulated the Debtor's COMI, implying that the Debtor should have sought reorganization in the People's Republic of China ("China").

2

The Court conducted a trial of the disputed factual issues on July 17, 2014.  Having heard

Walker's testimony and reviewed the extensive documentary record, the Court is satisfied that

(1) the Debtor does not conduct business in the Northern District of California and there was no

basis to place venue in that jurisdiction, (2) while the JPLs established a bank account in New

York, in part, to satisfy the eligibility requirements for being a Debtor, they did not intend and

their actions did not wrest the venue of the case from California, and (3) they did not manipulate

the Debtor's COMI; the activities they undertook that had the effect of establishing the Debtor's

COMI in the Cayman Islands were consistent with their duties as provisional liquidators in the

Foreign Proceeding.

Accordingly, the petition for recognition is granted and the cross-motion to change venue

is denied.

## BACKGROUND[1]

### A.     The Debtor's Business Operations

The Debtor is a Cayman Islands exempted company formed on August 8, 2005.  (PX 2.)

Its registered office is P.O. Box 309 GT, Ugland House, South Church Street, George Town,

Grand Cayman.  (PX 3 at SPH000008542.)  It is a holding company and ultimate parent for a

group of direct and indirect subsidiaries (the "Suntech Group") that are engaged in the business

of developing, manufacturing and marketing photovoltaic ("PV") modules and cells and

providing PV integration services worldwide for residential, commercial and industrial use.  (SX

1 at ¶¶ 10-11.)  The Debtor's principal American indirect subsidiary is Suntech America, Inc.

("Suntech America").  Suntech America was incorporated in Delaware in 2006, has been

---

[1]     In this opinion, "Tr." refers to the trial transcript (ECF Doc. #62), "PX" refers to the Petitioners' exhibits
received in evidence, and "SX" refers to Solyndra's exhibits received in evidence.

registered to do business in California since its incorporation and is based in San Francisco.  (PX

44; PX 16 at § 9.5.1.)

Aside from the Debtor, none of the Suntech Group is incorporated in the Cayman Islands,

(*see* PX 11), and none of the Suntech Group conducts business in the Cayman Islands.

Moreover, it is undisputed that prior to the commencement of the Foreign Proceeding on

November 5, 2013, the Debtor did not conduct business in the Cayman Islands and regularly

listed the location of its principal executive offices as R&D Mansion, 9 Xinhua Road, New

District, Wuxi, Jiangsu Province, 214028 in China.  (*E.g.*, SX  83-97.)[2]

The Debtor's principal debt arises from a United States debt offering evidenced by notes

in the amount of $575 million issued in 2008 and due on March 15, 2013 (the "Notes").  (PX 31

at SPH00008884; Tr. at 44:2–10.)  Its other debts include approximately $50 million owed to the

International Finance Corporation ("IFC") on account of a convertible loan, (PX 15 at

SPH00007102), and a substantial amount owed to affiliates.  (*See* PX 43 at 1, 2.)  Finally, the

Debtor is a defendant in several pending litigations.  In particular, Solyndra has brought antitrust

litigation against the Debtor and others seeking to recover at least $1.5 billion in damages.  (SX

76 at ¶ 7.)  The lawsuit is pending in the Northern District of California.

The Debtor's assets as of November 30, 2013 (roughly three weeks after the

commencement of the Foreign Proceeding) consisted of $2.6 million in cash, (PX 15 at § 9.1.1),

and $1.46 billion in receivables, the majority of which were due from four subsidiaries.  (*Id.* §

---

[2]       As an exempted company, the Debtor could "not trade in the Cayman Islands with any person, firm or
corporation except in furtherance of the business of the Company carried on outside the Cayman Islands."  (PX 3, at
SPH00008543.)

9.1.2 at SPH00007100.)  Their collectability was questionable as a result of the financial position

of the subsidiaries.  (*Id.*)  The Debtor had another $40 million in a bank account, but the cash

was collateral and had been seized.  (*Id.* § 9.1.2 at SPH00007101).  Finally, the Debtor held

investments in certain subsidiaries and a non-affiliate.  (*Id.*)

**B.      The Foreign Proceeding**

The Debtor defaulted when the Notes matured on March 15, 2013.  (Tr. at 44:2–6.)  On

September 23, 2013, the Debtor and funds managed by Clearwater Capital Partners, LLC

("Clearwater") and Spinnaker Capital LLC ("Spinnaker"), collectively holding approximately

50% of the Notes, (Transcript of Deposition of Edward Cairns held July 3, 2014 ("Cairns Tr."),

at 10:25–11:11), executed a Restructuring Framework Agreement (the "RFA").  (PX 32.)  The

RFA contemplated that the Notes and the IFC loan would be restructured through a scheme of

arrangement implemented in the Cayman Islands, and if necessary, a chapter 15 filing.  (*Id.* at §

2.5(c).)

Clearwater's representative, Edward Cairns, testified at his deposition that the Cayman

Islands was specified because it was the most logical and appropriate jurisdiction in which to

restructure the Debtor's financial affairs.   The Debtor was a Cayman Islands corporation, and

the scheme of arrangement was a "flexible" and "cost effective" method for dealing with the

Debtor's financial problems.  (Cairns Tr. at 23:9–24.)[3]  The chapter 11 alternative was rejected

due to concerns about costs and the ability of management to maintain control of the Debtor.

(Cairns Tr. at 24:8–25:10.)[4]  Finally, Clearwater flatly rejected the possibility of a restructuring

---

[3]        Solyndra's counsel objected to the form of the question that elicited this information.  (*See* Cairns Tr. at
23:8.)  The objection is overruled.

[4]        Solyndra's counsel objected to the form of the question that elicited this information.  (*See* Cairns Tr. at
24:12.)  The objection is overruled.

in China.  The Chinese court's jurisdiction was in doubt, and China has different concepts of the rules of law and creditors' rights compared to those found in the Cayman Islands and the United States; it is the last place that one would go.  (Cairns Tr. at 27:18–28:17.) [5]

On November 5, 2013, Christopher Michael Nacson, a director of the Debtor owed $16,666 in board fees, filed a winding up petition in the Grand Court of the Cayman Islands (the "Cayman Court").  The petition asked the Cayman Court to place the Debtor into a provisional liquidation proceeding and appoint Walker and Stokoe, both of PwC Corporate Finance and Recovery (Cayman) in the Cayman Islands, as JPLs.  (PX 24 at 2.)  Two days later, the Cayman Court entered an order commencing the Foreign Proceeding and appointing Walker and Stokoe as JPLs pursuant to section 86 of the Cayman Islands Companies Law.  (PX 1 (the "Appointment Order").)

## C.      The JPLs' Management and Control of the Debtor

The Appointment Order authorized the JPLs to propose a compromise or arrangement with the Debtor's creditors, (PX 1 at ¶ 2), and seek relief under chapter 15 of the United States Bankruptcy Code.  (*Id.* at ¶ 3.)  Their authority included numerous specifically delineated powers, (*id.* at ¶ 4), detailed later in this opinion.  Among other things, the JPLs could take possession of the Debtor's assets, borrow money, open and close bank accounts, employ attorneys and staff, and exercise the Debtor's rights as a shareholder of its subsidiaries.  The Board retained control to manage the day-to-day affairs of the Debtor subject, however, to the JPLs' monitoring, oversight and supervision.  (*Id.* at ¶¶ 4(a), 8.)  The management of matters outside of the ordinary course of business required the JPLs' approval.  (*Id.* at ¶ 8.)

---

[5]      Solyndra's counsel objected to the form of the question that elicited this information.  (*See* Cairns Tr. at 27:22-23.)  The objection is overruled.

Although the Appointment Order retained some authority for the Board, its role

following the JPLs' appointment substantially decreased.[6]  Walker assumed primary control, and

managed the Debtor's affairs from the Cayman Islands.  The JPLs published notices of their

appointment in several newspapers, including two newspapers in China, a newspaper in the

Cayman Islands, and the international edition of the Wall Street Journal (which is also published

in the United States), (PX 36, 37, 38, 39; Tr. at 56:14–57:5), directing interested parties to

contact a Cayman Islands-based member of Walker's staff.  (Tr. at 57:6–15.)  They also changed

the address of the Debtor's principal offices in its SEC filings from Wuxi, China to the Ugland

House in the Cayman Islands, (*compare* SX 104, dated Jan. 10, 2014 *with* SX 105, dated Jan. 17,

2014), and Walker's office at Strathvale House in the Cayman Islands (SX 106, dated Jan. 27,

2014;  SX 81, dated Feb. 6, 2014).  On January 20, 2014, Kim Liou, the Debtor's General

Counsel and Secretary at the time, sent letters to the IFC and Wilmington Trust Company

notifying them that subsequent notices and communications should be sent to Strathvale House

in the Cayman Islands. (PX 29; PX 30.)

Among the many pressing problems, Walker addressed the Debtor's cash needs as well

as the cash needs of the provisional liquidation.  According to the *First Report to Grand Court of

the Cayman Islands by the Joint Provisional Liquidators*, dated Dec. 20, 2013, (PX 15), the

Debtor did not have enough cash reserves to meet the costs likely to be incurred during the next

thirteen weeks.  (*Id.* at § 9.1.1.)  The Debtor's funds were controlled by certain authorized

signatories, and all but two of the Debtor's accounts were inaccessible because the funds were

---

[6]      The Board had decided not to pursue directors' and officers' liability insurance because it was too costly.
(PX 17 at SPH00007560R.)  The lack of insurance may have contributed to the Board's reluctance to make
decisions and defer to Walker.  (Tr. at 63:4–19.)

subject to liens in favor of certain guarantee creditors.  (Tr. at 74:5–15, 90:5–14.)  One of the

other accounts in Wuxi was used pay the expenses of the Debtor's limited support staff in Wuxi,

(Tr. at 72:6–73:7), and funds held in China were subject to numerous withdrawal restrictions.

(Tr. at 78:3–18.)

The JPLs worked with the Board and management to fund the looming shortfall.  (PX 15

at §§ 3.3, 9.1.1.)  They opened an account at HSBC in the Cayman Islands, and on December 5,

2013, Walker asked the Board to transfer $2 million to the account.  (PX 58.)  The HSBC

account was eventually funded in the approximate sum of $3.85 million in early February 2014

primarily through a transfer of funds held by the Debtor in Standard Chartered Bank (Hong

Kong) Limited.  (*See* PX 16 at § 11.1.1; PX 35 at SPH00008810.)  In addition, Walker obtained

a $7 million loan on the Debtor's behalf from Suntech America in order to finance the

restructuring efforts.  (PX 18.)  Michael Nacson, Chairman of the Board, apprised the Board of

the proposed loan during a January 23, 2014 telephonic meeting, told the Board he intended to

sign the loan agreement (but did not seek the Board's approval)[7] and informed the Board that the

JPLs would control the loan proceeds and make the final determinations with respect to payment

of post-petition legal fees.  (SX 7 at SPH00000111-12.)  Lastly, in March 2014, Walker

authorized an agreement on behalf of the Debtor with Wuxi Suntech under which it agreed to

pay $750,000 to the Debtor in exchange for the right to use the Debtor's export license (the

"Cooperation Agreement").  (*See* PX  7; Tr. at 60:23-61:2.)  Walker advised the Board of the

proposed transaction but did not seek the Board's approval.  (Tr. at 60:14–61:6.)

---

[7]     The loan agreement was executed by Kurt Metzger, a director of both the Debtor and Suntech America.
(PX 18 at 15.)

Walker also had to deal with the financial problems of the subsidiaries. He chaired a November 14, 2013 "extraordinary general meeting" of PSS, the Debtor's direct subsidiary, at which he exercised the Debtor's powers as sole shareholder to place PSS into a voluntary liquidation in the British Virgin Islands and appoint John Ayres as voluntary liquidator. (PX 21.) The Debtor filed a claim in the PSS proceeding in the amount of $737.6 million, but PSS had only $100,000 in its bank account. The potential value of PSS lies in the successful prosecution of claims against Suntech Singapore, Suntech Japan and Wuxi Suntech. (PX 16 at § 9.4.) On February 17, 2014, Walker arranged on behalf of the Debtor to loan $150,000 to PSS, (PX 50), to defray the legal fees incurred in pursuing these claims. (Tr. at 78:19–79:8.)

One of PSS's indirect subsidiaries, Suntech Power International Ltd. ("SPI"), is a Swiss company that indirectly owns and operates the Debtor's European and American operations, including Suntech America. SPI is insolvent, and a debtor in a Swiss administrative proceeding. (PX 16 § 9.1.1 at SPH00008765.) Walker met with the Swiss administrator in the SPI insolvency proceeding, and supported SPI's entry into a dividend agreement with its creditors, (*id.* § 9.1.1 at SPH00008766), to be funded by Suntech America. (*Id.* § 9.5.1 at SPH00008773.) The dividend was proposed to avoid an official liquidation and concomitant loss of value of both SPI and Suntech America to the Suntech Group. (*Id.*)

Walker acted as the Debtor's "point man" when dealing with its creditors. On February 12, 2014, he chaired the First Creditors Meeting held in the Cayman Islands, *inter alia*, to provide an update of the provisional liquidation. (PX 17.) A Liquidation Committee was elected consisting of China Development Bank, Clearwater, Spinnaker, SPI, and Wilmington Trust Company, (*id.* at § 8.3), and held its first meeting in the Cayman Islands on February 20, 2014.

(PX 57 at SPH00006537R.)  The members appeared telephonically, while Walker and others
attended in person.  (*Id.*)

After his appointment, Walker led the efforts to appeal the New York Stock Exchange's
decision to delist the Debtor's American Depositary Shares ("ADS").  (Tr. at 59:19–60:9; *see* PX
15 at §§ 4.1, 4.2; PX 16 at § 10.)  Prior to the delisting, the Board had played a role in scheduling
meetings regarding a potential $150 million investment by Guolian, the investment arm of the
Wuxi local government.  (Tr. at 69:17–70:18, 81:18–25.)  When the Debtors' appeal of its
delisting was denied in early February 2014, the Guolian investment fell through, (Tr. at 59:19–
60:5, 69:17–70:18), the Debtor's CEO resigned and has yet to be replaced, (Tr. at 49:25–50:13),
and the Board's responsibilities diminished even further.  (Tr. at 69:2–9.)

Finally, the JPLs took steps to obtain possession of the stock certificates in the Debtor's
two wholly-owned subsidiaries, PSS and Suntech Power (Hong Kong) Co. ("Suntech Hong
Kong").  The PSS stock certificates arrived on February 19, 2014, and the Suntech Hong Kong
stock certificates arrived during the week commencing February 24, 2014.  (PX 6.)  The
Debtor's shareholder registry and statutory records were also transferred to the Cayman Islands
at the JPLs' request, but Walker did not recall when.  (Tr. at 103:7-15.)

**D.      New York Proceedings**

**1.      The Involuntary Bankruptcy Case**

Following the Debtor's default on the Notes in March 2013, certain Noteholders
commenced lawsuits against the Debtor in the United States District Court for the Southern
District of New York to enforce the Notes.  (*See Trondheim Capital Partners, L.P. and Michael
Meixler v. The Debtor Co., Ltd.*, Case No. 13-CV-4668 (S.D.N.Y.); *Marcus and Jessica Dugaw,*

*Husband and Wife, and the Marital Community Composed Thereof v. The Debtor Co., Ltd.*, Case
No. 13-CV-5608 (S.D.N.Y.).  On September 20, 2013, they obtained judgments in the aggregate
sum of $578,230.88, plus post-judgment interest.  (PX 23 at SPH00001933R-34R; *see also* PX
41; PX 42.)  On October 14, 2013, the Noteholders, now Judgment Creditors, together with a
fourth creditor (collectively, the "Petitioning Creditors"), commenced an involuntary chapter 7
bankruptcy case (the "Involuntary Case") against the Debtor in the United States Bankruptcy
Court for the Southern District of New York.

Up to this point, the Debtor's connections with New York were admittedly thin.  Its ADS
had been listed on and eventually delisted by the New York Stock Exchange.  The Notes were
issued pursuant to an Indenture governed by New York law, (PX 31 at § 12.09), and required the
Debtor to maintain a Paying Agent and Registrar in New York.  (*Id.* at §§ 2.03, 4.02.)  The
parties to the Indenture submitted to the non-exclusive jurisdiction of any state or federal court
located in the borough of Manhattan, and the Debtor irrevocably waived any objection to venue
in the New York Supreme Court or the United States District Court for the Southern District of
New York.  (*Id.* at § 12.10.)  This provision presumably formed the basis for the Judgment
Creditors' New York federal actions.  Finally, the Debtor designated CT Corp. in New York City
to act as agent for service of process under the Indenture.  (*Id.*)

The Debtor moved to dismiss the Involuntary Case on November 5, 2013, the same day
that the petition commencing the Foreign Proceeding was filed.  Given the dearth of New York
connections, the Debtor argued, *inter alia*, that venue in the Southern District of New York was
improper.  The Debtor's General Counsel submitted a declaration attesting that the Debtor had
no employees, operations, bank accounts or other significant assets in the Southern District of
New York.  (SX 78 at ¶ 5.)  The Debtor's supporting memorandum stated that "Suntech [Power

11

Holdings] neither resides nor is domiciled in New York, and does not have its 'principal place of business in the United States' or 'principal assets in the United States' in New York."  (SX 77 at 2.)  (*See Suntech Holdings Power Co., Ltd.'s Memorandum of Law in Support of Motion to Dismiss the Amended Involuntary Chapter 7 Petition*, dated Dec. 9, 2013 (ECF Case No.13–13350 Doc. #32).)

On January 27, 2014, the Debtor, the JPLs, the Petitioning Creditors and certain Noteholders entered into a Restructuring Support Agreement ("RSA") to resolve the Involuntary Case.[8]  (PX 23.)  The RSA included the following provisions:

1.    The JPLs agreed to commence a chapter 15 case in this Court on or before February 21, 2014, (*id.* at § 2(a));

2.    The parties agreed to sign a stipulation of dismissal of the Involuntary Case with prejudice upon execution of the RSA, (*id.* at § 2(c)), and with certain exceptions, file it upon approval of the recognition order, (*id.* at § 4);

3.    The failure to obtain recognition of the Foreign Proceeding by May 31, 2014 constituted a termination event, (*id.* at § 9.1(b)), but Walker testified that deadline had been extended to mid-August, (Tr. at 56:2–8);[9] and

4.    The parties agreed to seek the dismissal of the Debtor's appeal of the New York federal judgments once the RSA was signed, (*id.* at § 2(d)), and those appeals were dismissed on March 3 and 4, 2014.  (*See* PX 62; PX 63.)

## 2.    The Chapter 15 Case

The RSA gave the JPLs less than four weeks to commence a chapter 15 case in the Southern District of New York, but the Debtor had no ostensible property or business in New York or  anywhere else in the United States.  Consequently, the JPLs took steps to establish a

---

[8]    The Board authorized the RSA, although it acknowledged that the JPLs "have the power and authority to execute the [RSA]."  (SX 7 at SPH00000121.)  In addition, the JPLs expressly represented in the RSA that they had the authority to bind the Debtor to the agreement.  (PX 23 § 13(a) at SPH00001949R.)

[9]    By letter dated October 29, 2014, the Petitioning Creditors advised the Court that the RSA had terminated automatically on August 14, 2014, and requested that the Court order relief under chapter 7 of the Bankruptcy Code.  (ECF Case No. 13-13350, Doc. # 48.)

New York bank account, but the task proved daunting.  On February 17, 2014, counsel to certain Noteholders contacted Morgan Stanley on the Debtor's behalf to establish a bank account in New York.  (SX 20.)  The following day, representatives of Morgan Stanley reported that the bank could not complete its due diligence within the proposed time frame.  (SX 20 at SPH00007229R.)

The same day, the Debtor's bankruptcy counsel contacted Francine Gordon of Kurtzman Carson Consultants LLC ("KCC") asking whether KCC could act as an escrow agent for the Debtor's funds because it "need[ed] the actual account to be in NY" by the end of the week (*i.e.*, February 21, 2014).  (SX 31 at KCC000096.)  KCC had performed this service for other clients in the past.  (Transcript of Deposition of Drake Foster held May 6, 2014 ("Foster Tr."), at 57:4–21, 78:4–25.)  On February 19, 2014, KCC notified the Debtor's counsel that there were "two bank accounts at Bank of New York Mellon ready to receive the cash."  (SX 30 at KCC 000112.)  The Bank of New York Mellon ("BONY") account was not an escrow account, and the holder of the account was Computershare, Inc.[10]  (*See* SX 33.)

On February 20, 2014, one day before the RSA deadline, the JPLs sent a letter to KCC/Computershare, Inc. establishing procedures for disbursing funds from the BONY account (the "Disbursement Letter").  (PX 8.)  The letter stated that upon receipt of written instructions from the JPLs, KCC would instruct the BONY to issue the checks or wire transfers as requested. The letter was signed by both JPLs, but neither KCC nor Computershare signed it.  (*See* PX 8.) Still on February 20, 2014, the JPLs transferred $500,000 from the Debtor's Cayman Islands

---

[10]    Computershare is the parent of KCC.  (Foster Tr. at 57:5-7.)  Computershare and KCC have been used interchangeably by the witnesses and the parties, and will be used interchangeably in this opinion.

account to the BONY account.  (PX 35 at SPH00008812 (transfer out of Cayman account); PX

45 at SPH00008896 (transfer into BONY account).)

The chapter 15 case was commenced the next day, on February 21, 2014. (*Chapter 15*

*Petition for Recognition of Foreign Proceeding*, filed February 21, 2014, (ECF Doc. #1).)

Solyndra opposed recognition and cross-moved to change venue.

## DISCUSSION

Under Bankruptcy Code § 1517(a), and subject to exceptions that are not relevant in this

case, a Court must recognize a foreign proceeding if

> (1) such foreign proceeding for which recognition is sought is a foreign main
> proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

Solyndra does not dispute that the JPLs have satisfied the second and third requirements.

(*Solyndra Residual Trust's Proposed Findings of Fact and Conclusions of Law on Chapter 15*

*Petition*, dated Aug. 15, 2014, at *Conclusions of Law* ¶ 25, (ECF Doc. #66).)  Instead, Solyndra

contends that the JPLs have failed to establish that the Foreign Proceeding qualifies as a main or

nonmain proceeding.  (*Id.*)  Before reaching this issue, two preliminary questions must be

answered:  is the Debtor eligible to be a debtor under the United States Bankruptcy Code, and if

so, is venue proper in the Southern District of New York?  We start with these.

## A.    Eligibility to be a Debtor

"[O]nly a person that resides or has a domicile, a place of business, or property in the

United States . . . may be a debtor under" the Bankruptcy Code. 11 U.S.C. § 109(a).  This

requirement applies to foreign debtors seeking relief under chapter 15. *Drawbridge Special*

*Opportunities Fund LP v. Barnet* (*In re Barnet*), 737 F.3d 238, 247 (2d Cir. 2013).  The Debtor

does not have a residence or domicile in the United States.  Although Solyndra contends that the

Debtor has a place of business in the Northern District of California, and hence, is eligible to be a

debtor on that basis, the JPLs disagree.  Instead, they contend that the Debtor owns the BONY

account, and rely on that account as the basis for its eligibility.

As the BONY account is located in New York, New York law governs the question of

ownership.[11]  *Neto v. Thorner*, 718 F. Supp. 1222, 1225 (S.D.N.Y. 1989) ("[U]nder New York

law, the title to a bank account held in a New York bank is governed by the law of New York.")

Under New York law, the party who possesses property is presumed to own it, and one who

holds funds in a bank account possesses that account and the presumption of ownership follows.

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d

70, 86 (2d Cir. 2002); *LFD Operating Inc. v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores,

Inc.*), 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1,

2004), *aff'd*, 144 Fed. Appx. 900 (2d Cir. 2005).  The presumption of ownership may be rebutted

by evidence that another person actually owns the property, either by showing that he effectively

exercises control over the property or that the ostensible owner holds the property for his benefit.

*Karaha Bodas*, 313 F.3d at 86; *see also Ames Dep't Stores*, 274 B.R. at 614 (stating that where

debtor holds property as a trustee or an agent, the property or proceeds of the property would not

become property of the debtor's bankruptcy estate).

As the titleholder of the BONY account, Computershare is its presumptive owner.  The

Debtor seeks to rebut the presumption by showing that Computershare held the funds in the

---

[11]      Even if the law of the Cayman Islands or some other jurisdiction governed the question of ownership,
neither side has identified an actual conflict with New York law.

BONY account as its agent.  *See Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp.

360, 375 (S.D.N.Y. 1992) ("It is presumed that title to a principal's property in the possession of

his agent remains in the principal.") (quoting *Lalor v. Duff*, 281 N.Y.S.2d 614, 617 (N.Y. App.

Div. 1967)); *Baker v. New York Nat'l Exch. Bank*, 2 N.E. 452, 452 (N.Y. 1885) (noting the "well

established" principle that title of goods in possession of an agent remains with the principal).

An agency relationship may be established by written or oral contract or by conduct of the

principal, which reasonably causes the agent to believe that the principal wishes the agent to act

on the principal's account.  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 343 (S.D.N.Y.

2010).  The party asserting the existence of an agency relationship bears the burden of

establishing its existence.  *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 350

(S.D.N.Y. 2013).

     I find from the evidence that Computershare held title to the BONY account as agent for

the Debtor, and conclude that it is the Debtor's property.  The RSA required the JPLs to file the

chapter 15 by February 21, 2014.  As the JPLs saw it, the Debtor had no presence, business or

assets in the United States and had to establish a bank account in the United States to satisfy the

requirements for eligibility.  Walker admitted as much.  (Tr. at 53:12-17.)  The RSA deadline

was rapidly approaching, and the JPLs could not open a bank account in the Debtor's name

because Morgan Stanley could not complete due diligence in time.  Computershare stepped in

and agreed to hold the Debtor's deposit for the Debtor's benefit just as a traditional bank would

have done if time had permitted.

     Notwithstanding the title of the account and Computershare's failure to sign the

Disbursement Letter, both parties understood that Computershare was acting as the JPLs' agent,

and the account was subject to the JPLs control.  Walker testified that it was his understanding

that the funds in the account belonged to the Debtor and the JPLs had complete and unfettered

control over the funds.  (Tr. at 53:25–55:19.)  Foster, KCC's General Counsel, (*see* Foster Tr. at

21:24-22:4), concurred.  He testified at his deposition that Computershare had no interest in the

funds and held them as an escrow agent or in an administrative capacity for the benefit of its

client.  (Foster Tr. at 58:1-23.)[12]  The account was ultimately set up as an FBO account for the

benefit of the Debtor; Computershare held the funds as a disbursing agent, (*id.* at 61:6-12)[13] and

segregated the Debtor's from its own funds and the funds of its other clients.  (Foster Tr. at

67:24-68:5.)  Foster added that funds would only be released when KCC received proper

instructions in accordance with the document that contained the parameters governing

distribution.  (Foster Tr. at 54:5–21.)[14]  Finally, Computershare's internal records reflected that

the name of the account was "Computershare, Inc. as agent for Suntech."  (SX 70-74.)

The parties' subsequent conduct confirmed their understanding.  On June 19 and June 20,

2014, Walker signed disbursement authorization forms instructing KCC to wire funds from the

BONY account to professionals in the United States, including KCC, O'Melveny & Myers LLP,

and Teitelbaum & Baskin LLC.[15]  (PX 46.)  The funds were transferred per Walker's

instructions, (PX 45 at SPH00008900), and Walker never encountered difficulties accessing

---

[12]    The Debtor's counsel objected to the question that elicited this information on the grounds that it misstated testimony and lacked foundation.  (*See* Foster Tr. at 57:24-25.)  The objection is overruled.

[13]    The Debtor's counsel objected to the question that elicited this information on the grounds that it lacked foundation, called for a legal conclusion and was vague and ambiguous.  (*See* Foster Tr. at 61:23.)  The objection is overruled.

[14]    The Debtor's counsel objected to the question that elicited this information on the grounds that it lacked foundation and the document spoke for itself.  (*See* Foster Tr. at 53:21-22, 54:8.)  The objection is overruled.

[15]    O'Melveny & Myers LLP represents the Debtor and Teitelbaum & Baskin LLC represents the Petitioning Creditors in the Involuntary Case.

those funds.  (*Tr.* at 55:14–16.)  Accordingly, the Debtor rebutted the presumption of ownership and demonstrated at trial that the BONY account was the property of the Debtor.

The establishment of the BONY account in New York prior to the commencement of the chapter 15 proceeding was sufficient to render the Debtor eligible under 11 U.S.C. § 109(a).  *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014); *In re Yukos Oil Co.*, 321 B.R. 396, 407 (Bankr. S.D. Tex. 2005).  Focusing on venue rather than eligibility, Solyndra nevertheless contends that the JPLs opened the BONY account to manipulate the placement of the case in this Court rather than in the Northern District of California where the Debtor allegedly had its principal place of business in the United States at the time the JPLs filed the chapter 15 petition.

Section 109(a) "says nothing about the amount of such property nor does it direct that there be any inquiry into the circumstances surrounding the debtor's acquisition of the property, and is thus consistent with other provisions of the Code that reject lengthy and contentious examination of the grounds for a bankruptcy filing."  *Octaviar*, 511 B.R. at 373 (footnotes omitted).  The Debtor had to establish its eligibility through a domicile, residence, property or a place of business in the United States.  The Debtor did not maintain a residence or domicile in the United States, and the JPLs never entertained the belief that the Debtor maintained a place of business in California.   Furthermore, the Debtor did not and could not conduct business in California for the reasons discussed in the next section.  The BONY account satisfied the express requirements for eligibility under § 109(a) to permit the JPLs to file the chapter 15 contemplated by the RSA as necessary to restructure the Debtor.

18

Solyndra argues that the JPLs' conduct was somehow improper, but I disagree.

Interpreting the Bankruptcy Code to prevent an ineligible foreign debtor from establishing

eligibility to support needed chapter 15 relief will contravene the purposes of the statute to

provide legal certainty, maximize value, protect creditors and other parties in interests and rescue

financially troubled businesses.  *See* 11 U.S.C. § 1501(a).  The Debtor oversees a multi-national

group of corporations engaged in the solar energy business.  Despite the lack of a United States

presence, it owes a substantial amount of United States debt and requires recognition as a

condition to the enforcement of the scheme of arrangement in the United States that the JPLs

hope to achieve in the Foreign Proceeding.  Absent the enforcement of the scheme, which will

presumably include a form of discharge or injunction restraining the collection of some or all of

the pre-scheme debts, the Debtor will be hindered from ever establishing a United States

presence or conducting future business in the United States for fear that creditors will seize its

United States assets.  Shutting the door on the Debtor, where it has no other access, will hinder

the restructuring of this multi-national business as contemplated by chapter 15.

**B.    Venue**

Title 28, section 1410 governs venue of a chapter 15 proceeding.  It provides:

A case under chapter 15 of title 11 may be commenced in the district court of the
United States for the district-

(1) in which the debtor has its principal place of business or principal assets in the
United States;

(2) if the debtor does not have a place of business or assets in the United States, in
which there is pending against the debtor an action or proceeding in a Federal or
State court; or

(3) in a case other than those specified in paragraph (1) or (2), in which venue will
be consistent with the interests of justice and the convenience of the parties,
having regard to the relief sought by the foreign representative.

Section 1410 establishes a "hierarchy of choices."  1 ALAN N. RESNICK & HENRY J.

SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) ("COLLIER") (quoting H.R. REP.

NO. 109-31, at 119 (2005).  If the debtor maintains its principal place of business or principal

assets in the United States in a particular district, venue must be placed in that district;[16] if not,

we turn to subparagraph two.  If there is no litigation pending against the debtor in a district,

subparagraph three then applies.

The Court has concluded that the BONY account is an asset of the Debtor.  No evidence

was proffered showing that the Debtor had any other assets in the United States.  Its indirect

subsidiary, Suntech America, operates in California, but the assets of a subsidiary are not the

assets of the parent.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003); *In re Touch*

*Am. Holdings, Inc.*, 401 B.R. 107, 126 (Bankr. D. Del. 2009); *Regency Holdings (Cayman), Inc.*

*v. Microcap Fund, Inc.* (*In re Regency Holdings (Cayman), Inc.*), 216 B.R. 371, 375 (Bankr.

S.D.N.Y. 1998) ("parent's ownership of all of the shares of the subsidiary does not make the

subsidiary's assets the parent's").  *A fortiori*, the assets of an indirect subsidiary are not the assets

of a more distant ancestor.  Accordingly, the BONY account represented the Debtor's principal

United States assets at the time the JPLs filed the chapter 15 petition.

Solyndra argues that the Debtor maintained its principal United States place of business

in San Francisco at the time the chapter 15 petition was filed and the JPLs manipulated the venue

of the case by establishing the BONY account.  Solyndra points to two items of evidence in

support of its contention.  First, the Debtor's Secretary and General Counsel, Kim Liou, was

employed in California – presumably in San Francisco.  (Tr. at 48:4–6.)  Even after the JPLs'

---

[16]     If the debtor has its principal United States assets in one district and its principal United States place of
business in another district, it can place venue in either district under 28 U.S.C. § 1410(1).

appointment, Mr. Liou continued to sign SEC filings at least through late January 2014, (SX 106), provided advice to the Debtor's Board, (*see* SX 9), and attended Board meetings.  (*See* SX 12.)  Second, the Debtor filed a Form 20-F with the SEC for the fiscal year ended December 31, 2011 in which it stated that "we" built "regional headquarters" in "San Francisco for the United States."  (SX 80 at 14.)

This evidence does not support the finding that that the Debtor, as opposed to Suntech America, maintained its principal place of business in the United States in San Francisco.  The Debtor is a holding company for a group of direct and indirect subsidiaries that operate worldwide.  A corporation's principal place of business refers "to the place where a corporation's officers direct, control, and coordinate the corporation's activities," *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) (construing "principal place of business" in federal diversity jurisdiction statute); *accord* 17 DANIEL R COQUILLETTE, ET AL., MOORE'S FEDERAL PRACTICE § 110.43[2][a], at 110-91 (3d ed. 2014) (The "principal place of business" for bankruptcy venue purposes "is the most important, consequential or influential place where the entity conducts business.  This is likely to be the place where the entity's management decisions are made, but in some cases may be where day-to-day-operations are conducted."), and the same rule applies to a holding company.  *See Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 495 (E.D. Pa. 2012), *aff'd*, 724 F.3d 337 (3d Cir. 2013).

The record does not support a finding that the Debtor conducted any business in California.  A foreign corporation cannot conduct business in California without obtaining a certificate of qualification from the California Secretary of State, CAL. CORP. CODE § 2105(a) (West 2014) (amended 2014), and there is no evidence that the Debtor was authorized to conduct business in California or that it conducted business in California.  No member of the Debtor's

management other than Mr. Liou was present in California, and even his official address was

listed with the SEC as "c/o Suntech Power Holdings Co., Ltd., 9 Xinhua Road, New District,

Wuxi, Jiangsu Province 214028, People's Republic of China."  (SX 80 at 92.)  Furthermore, to

the extent he attended in-person Board meetings, those meetings were held in the Cayman

Islands after the appointment of the JPLs, and he attended telephonically.  (*See* SX 12.)

Similarly, he provided legal advice to the Debtor's management who were located in the

Cayman Islands and elsewhere.  (*See* SX 9.)

Nor did Mr. Liou have authority to conduct the business of the Debtor in his capacity as

Secretary or General Counsel**.**[17]  Pursuant to the Debtor's Second Amended and Restated

Memorandum & Articles of Association, adopted Oct. 26, 2005 (the "Articles") (PX 3), the

management of the Debtor was vested in the Directors subject, however, to the provisions of the

Articles, the Cayman Islands Companies Law and any resolutions made at a general meeting.

(PX 3 at § 86.)  The Directors were empowered to appoint officers, including a Secretary, "to

perform such duties . . . as the Directors from time to time decide," (*id.* at § 127), and "with such

powers and duties as the Directors may think fit."  (*Id.* at § 87.)  The Articles do not specify any

duties imposed on the Secretary or the General Counsel to conduct the Debtor's business, the

Companies Law (2013 Revision), (PX 40), is also silent, and there is no evidence of any

resolutions empowering the Secretary or General Counsel to conduct the Debtor's business.

Moreover, to the extent that Mr. Liou had been granted any authority to act for the Debtor, he

had no authority to act on behalf of the Debtor once the JPLs were appointed except at the JPLs'

direction.  (Tr. at 48:7–14.)  Furthermore, he resigned effective May 26, 2014.  (PX 33 at 3.)  Mr.

Liou did sign the Debtor's SEC filings as might be expected in his capacity as General Counsel.

---

[17]    Mr. Liou was also General Counsel of Suntech Arizona, Inc.  (SX 107.)

But the execution of the SEC filings, while incident to the Debtor's solar energy business, did not involve the conduct of the Debtor's solar energy business or place Mr. Liou at its "nerve center."

Finally, the statement in the 2011 Form 20-F that "we" built regional headquarters in San Francisco does not imply what Solyndra contends.  According to the definitional section in the form, references to "'Suntech,' 'we,' 'us,' 'our company' and 'our' are to Suntech Power Holdings Co., Ltd., its predecessor entities and its consolidated subsidiaries."  (SX 80 at 3.)  In other words, "we" included Suntech America.  The statement does not mean that the Debtor built its own headquarters in San Francisco.  The more plausible interpretation is that the regional headquarters in San Francisco housed Suntech America, the only member of the Suntech Group actually located there.

In summary, the Debtor did not have any place of business or assets in the United States immediately prior to the commencement of the chapter 15 case.  The place of business and assets of Suntech America were not the Debtor's place of business or assets, and did not make the Debtor eligible to be a debtor or provide a basis for venue.  The JPLs established the BONY account to solve the eligibility problem, and the BONY account also had the effect of establishing a basis for venue in this district under 28 U.S.C. § 1410(1).  The JPLs did not manipulate venue by grabbing it from the Northern District of California because the Debtor was ineligible to be a debtor in the Northern District of California or anywhere else until it established the BONY account.  Accordingly, *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012) and similar decisions discussed by Solyndra are distinguishable.

C.    COMI

The Debtor seeks recognition of the Foreign Proceeding as a foreign main proceeding.[18]

A "'foreign main proceeding' means a foreign proceeding pending in the country where the

debtor has the center of its main interests,'" 11 U.S.C. § 1502(4), or COMI.  "In the absence of

evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the

debtor's main interests."  11 U.S.C. § 1516(c).  "[A] debtor's COMI is determined as of the time

of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its

COMI, a court may also look at the time period between the initiation of the foreign liquidation

proceeding and the filing of the Chapter 15 petition."  *Morning Mist Holdings Ltd. v. Krys* (*In re*

*Fairfield Sentry Ltd.*), 714 F.3d 127, 133, 137 (2d Cir. 2013).

The COMI analysis permits consideration of any relevant activities, including liquidation

activities and administrative functions.  *Fairfield Sentry,* 714 F.3d at 137.  The following non-

exclusive group of factors guides the analysis, "but consideration of these specific factors is

neither required nor dispositive," *id.*:

> Various factors, singly or combined, could be relevant to such a determination:
> the location of the debtor's headquarters; the location of those who actually
> manage the debtor (which, conceivably could be the headquarters of a holding
> company); the location of the debtor's primary assets; the location of the majority
> of the debtor's creditors or of a majority of the creditors who would be affected
> by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10

(S.D.N.Y. 2007).)  In addition, the court may consider the location of the debtor's "nerve

center," "including from where the debtor's activities are directed and controlled, in determining

---

[18]    In the alternative, the Debtor seeks recognition of the Foreign Proceeding as a foreign non-main
proceeding.  In light of the disposition of the Debtor's principal request, it is unnecessary to reach the alternative
request.

a debtor's COMI." *Fairfield Sentry*, 714 F.3d at 138 n. 10.  Finally, international sources of law

that the court may look to "underscore[] the importance of factors that indicate regularity and

ascertainability." *Id.* at 138.

The Debtor's presumptive COMI is the Cayman Islands where it was incorporated.

However, the Cayman Islands was not its actual COMI when the Foreign Proceeding was

commenced.  Up to that point, the Debtor did not conduct any activities in the Cayman Islands,

and maintained its principal executive offices in Wuxi, China from where it managed the

Suntech Group.  The issue to be decided, however, is the Debtor's COMI at the time of the

commencement of the chapter 15 case.  This comes down to whether the commencement of the

provisional liquidation and the activities of the JPLs had the effect of transferring the COMI

from Wuxi, China to the Cayman Islands.

The answer is not obvious in a case like this.  Unlike *Fairfield Sentry*, which involved the

straight foreign liquidation of a Madoff feeder fund akin to a chapter 7 case, the Foreign

Proceeding is a provisional liquidation more like a chapter 11 case in which a trustee has been

appointed but the debtor continues to operate subject to the trustee's supervision and control.

Nevertheless, the commencement of a provisional liquidation may have a profound effect on the

business of the debtor.  It triggers a restructuring process on which the survival of the debtor's

traditional business may depend, and it may shift the duties and responsibilities of running the

business from the debtor's management to the provisional liquidators.

Here, that shift is initially reflected in the Appointment Order.  The JPLs were authorized

to develop and propose a compromise or arrangement with the Debtor's creditors, (PX 1 at § 2),

and if necessary, file a chapter 15 case in the United States Bankruptcy Court or seek recognition

of the Foreign Proceeding in any other appropriate jurisdiction.  (*Id.* at §§ 3, 4(q).)  Toward that

end, the Appointment Order authorized the JPLs to exercise a host of additional powers.  Among

other things, the JPLs were empowered to do all acts on behalf of the Debtor, take possession of

its property and collect all debts, deal with all questions relating to or affecting the assets or the

restructuring, supervise the Debtor's bank accounts, open bank accounts to pay the expenses of

the provisional liquidation, hire staff and attorneys, borrow money, make the required filings

with the regulatory bodies and pay, and if necessary, prefer creditors as needed to minimize the

disruption to the day-to-day activities of the Debtor.  (*See id.* at § 4(b)-(m), (o), (p), (r).)  In

addition, the JPLs assumed control of legal proceedings involving the Debtor, including the

antitrust litigation brought by Solyndra.  (*Id.* at § 4(n).)

Importantly, the JPLs' authority extended to the operating subsidiaries.  They were

granted the power to exercise the rights of the Debtor, including its voting rights, as shareholder

of its subsidiaries or any entities in which it invested, (*id.* at § 4(e)), protect the assets of the

subsidiaries, (*id.* at § 4(g)), and pay and possibly prefer the creditors to the extent necessary to

minimize the interruption to the day-to-day activities of the subsidiaries.  (*Id.* at § 4(*l*).)

As noted earlier, the Appointment Order left the day-to-day management of the Debtor's

business to the Board subject to the JPLs' supervision and control.  (*Id.* at § 8; *see id.* at § 4(a).)

In practice, however, it exercised little day-to-day authority, and the record does not indicate

what the Board did beyond what the meeting minutes report.  Furthermore, the Debtor's CEO

resigned in February 2014, and the record does not show what, if anything, the Debtor's

management did on a day-to-day basis.  In fact, Clearwater and Spinnaker had insisted on a

Cayman Islands restructuring rather than a United States chapter 11, in part, because

management would maintain control of the Debtor in a chapter 11 case.  Furthermore, the Board

could not engage in transactions outside the ordinary course of business without the JPLs' approval, (*id*. at § 8), and could not open or close bank accounts on behalf of the Debtor without the JPLs' prior approval.  (*Id*. at § 8(c).)

The Appointment Order directed the JPLs to seek to agree on a protocol regarding the management of the Debtor and its subsidiaries.  (*Id*. at § 11.)  There is no evidence that this occurred, and in practice, the JPLs, especially Walker, assumed control of the Debtor's affairs pursuant to the powers granted in the Appointment Order.  They met with employees and creditors, opened a bank account in the Cayman Islands funded with transfers from one of the Debtor's other accounts, voted the Debtor's shares to place PSS in voluntary liquidation in the British Virgin Islands and appoint John Ayres as voluntary liquidator, filed a claim in the PSS proceeding in the amount of $737.6 million, and loaned $150,000 to PSS to fund litigation. The JPLs also worked to preserve the value of SPI and Suntech America through the agreement with SPI's administrator to pay a dividend to creditors, obtained a $7 million loan from Suntech America to finance the Debtor's restructuring, spearheaded the Debtor's challenge to the New York Stock Exchange's decision to delist its ADS, and entered into the Cooperation Agreement with Wuxi Suntech pursuant to which the latter paid $750,000 to the Debtor in exchange for its right to use the Debtor' export license.  Finally, they entered into the RSA and took steps to recover, and ultimately recovered, the physical shares in the Debtor's direct subsidiaries as well as the shareholder registry and statutory records.

Centered in the Cayman Islands, the JPLs took the necessary steps to centralize the administration of the Foreign Proceeding there.  They published notices of the Foreign Proceeding directing interested parties to contact members of Walker's staff in the Cayman Islands.  They changed the Debtor's address on SEC filings and informed the Debtor's lenders to

send future notices to their offices in the Cayman Islands.  They conducted Board meetings and

creditor meetings, largely through telephonic participation, from the Cayman Islands and

appointed a Caymans Island director.  Cairns testified that the JPLs are the primary Debtor

representatives with whom he communicates since the commencement of the Foreign

Proceeding, and it is Cairns' understanding that they are running Suntech Group on a daily basis.

(Cairns Tr. at 33:9–20.)

        In opposing the recognition of the Foreign Proceeding, Solyndra contends that the

Debtor's COMI was not located in the Cayman Islands.  First, the Debtor represented to the

world that it was headquartered in Wuxi, China, and that is where creditors and other

stakeholders would have expected it to reorganize elsewhere, presumably in China.  While the

Debtor represented that its principal offices were located in Wuxi prior to the commencement of

the Foreign Proceeding, the JPLs changed the location of the principal offices to the Cayman

Islands on the Debtor's SEC filings and notified their lenders to send future communications to

the Cayman Islands.  The JPLs also centralized the administration of the Debtor's affairs and its

restructuring in the Cayman Islands following their appointment and prior to the commencement

of the chapter 15 case.

        Nor does the evidence support a finding that the Debtor's creditors would have expected

it to restructure its businesses in China.  The Debtor's largest creditor group was the

Noteholders.  The Indenture, (PX 31), was governed by New York law and the parties to the

Indenture submitted to the non-exclusive jurisdiction of the New York state and federal courts.

In addition, when the representatives of Clearwater and Spinnaker, who held approximately 50%

of the debt, met with the Debtor's representatives, they urged the Cayman Islands as the most

logical restructuring venue.  The Debtor was incorporated in the Cayman Islands and the

28

Cayman Islands employed a predictable, flexible and cost effective method for dealing with restructuring. They rejected a chapter 11 proceeding for reasons of cost and management control, and according to Cairns, summarily dismissed China due to uncertainties regarding jurisdiction and creditor's rights, calling it the last place that one would want to go.

Second, Solyndra argues that all of the Debtor's directors, decision makers and employees resided outside of the Cayman Islands. Again, this was true prior to the appointment of the JPLs. But once they were appointed, they took over the management of the Debtor, employed their own staff and attorneys in the Cayman Islands, and through the exercise of the Debtor's rights as shareholder, assumed the Debtor's control over the Suntech Group.

Third, Solyndra maintains that the Debtor's primary assets – its bank accounts and intercompany receivables – are located outside of the Cayman Islands. The Debtor is a holding company. As such, it does not have operating assets, and its assets consist of cash and non-cash assets, including intercompany receivables, and investments. (PX 15 at § 9.1.) Solyndra points to the intercompany receivables as the principal asset, states that the principal intercompany debtors are PSS, Vantury Ltd. and Bright Path Holdings, all located in the British Virgin Islands, and Suntech Singapore, located in Singapore, and argues that the intercompany receivables are located where these debtors are found. (*See Solyndra Residual Trusts Proposed Findings of Fact & Conclusions of Law on Motion to Transfer Venue*, dated Aug. 1, 2014 ("*Solyndra Venue*"), at ¶¶ 9, 51 (ECF Doc. #63).) The JPLs have concluded, however, that there is "significant uncertainty" regarding the Debtor's ability to collect these receivables as a result of the financial condition of the subsidiaries. (PX 15 § 9.1.2 at SPH00007101.) In fact, the largest receivable in the sum of $917 million is owed by PSS; PSS is in liquidation and the receivable is presently

worthless.  As a consequence, the JPLs concluded that the Debtor was insolvent as of November 30, 2013.  (*Id.* § 9.1.2 at SPH00007100.)

In summary, the Court concludes for the reasons stated that the Debtor's COMI on the date of the commencement of the chapter 15 case was the Cayman Islands.  Solyndra next argues that even if this is so, the JPLs manipulated the COMI in bad faith.  Specifically, they (a) transferred stock certificates, shareholder registries, and statutory records to the Cayman Islands, (b) opened the Debtor's only Cayman Islands bank account (solely for the payment of professional fees), (c) appointed a director who resides in the Cayman Islands, and (d) held one Board meeting in the Cayman Islands.  Moreover, one of the reasons they opened the Cayman Islands bank account and arranged the appointment of a Cayman Islands director was to improve the prospects for obtaining chapter 15 relief.

The transfer of the stock certificates, shareholder registries and statutory records were consistent with the JPLs' duties under the Appointment Order as was the conduct of the Board meeting in PwC's offices in the Cayman Islands.[19]  (*See* SX 12.)  The same was true of the Cayman Islands bank account.  The JPLs required the account to pay the restructuring expenses. The account served a legitimate business purpose and was convenient to the JPLs.  It would not have made sense to open the account in another jurisdiction simply because a Cayman Islands bank account offered the additional benefit of improving the prospects for chapter 15 relief.  In short, these were steps that the JPLs took consistent with the Appointment Order and their roles in the Foreign Proceeding and they would have taken these actions even if they had never intended to file a chapter 15 case.

---

[19]    The Board also held two telephonic meetings during this period.  (*See* SX 7, 47.)  Walker and other PwC personnel participated in both.

Solyndra's last point concerns Pearson's appointment as a director of the Debtor – and the only Cayman Islands director – in February 2014.  Walker had suggested adding a Cayman Islands director at the January 23, 2014 Board meeting, (SX 7 at SPH00000117), and recommended Pearson, with whom he had worked on a committee of the Cayman Islands Insolvency Practitioners Association.  (Tr. at 59:1-18.)  He contacted Pearson the same day, informed him of the restructuring efforts, and apparently told him that a resident Cayman Islands Board member might be beneficial in securing chapter 15 recognition.  (SX 8 at SPH00000405.)

No one has questioned Pearson's credentials or qualifications, but it seems that his selection was motivated, at least in part, to bolster the contention that the Cayman Islands was the Debtor's COMI.  However, even if the Court discounts the selection of Pearson, the evidence supports the finding that the Debtor's COMI at the time of the commencement of the chapter 15 case was the Cayman Islands, and all of the other actions criticized by Solyndra were taken in furtherance of the JPLs duties under the Appointment Order and were not intended to transfer the Debtor's COMI from China or anywhere else even if they had that effect.  As a result, the Court concludes that the JPLs did not manipulate the Debtor's COMI in bad faith.

**D.    Cross-Motion to Change Venue**

Under 28 U.S.C. § 1412, a district court may transfer a case or proceeding under title 11 to a district court in another district "in the interest of justice or for the convenience of the parties."  *Accord*  FED. R. BANKR. P. 1014(a)(1).  Bankruptcy Courts in this district are authorized to transfer a case under § 1412 by virtue of 28 U.S.C. §§ 157(a) and 1334(b) and the District Court's order of reference.  *Amended Standing Order of Reference*, General Order M-431, dated Jan. 31, 2012 (Preska, C.J.); *Enron Corp. v. Arora* (*In re Enron Corp.*), 317 B.R. 629, 638 (Bankr. S.D.N.Y. 2004).  The decision to transfer venue lies within the sound discretion of

the court and is based on "an individualized, case-by-case consideration of convenience and

fairness." *Gulf States Exploration Co. v. Manville Forest Prods. Corp.*, (*In re Manville Forest*

*Prods. Corp.*), 896 F.2d 1384, 1391 (2d Cir.1990) (quoting *Stewart Org., Inc. v. Ricoh Corp.,*

487 U.S. 22, 29 (1988)).   The party seeking to change venue bears the burden of proof by a

preponderance of the evidence.  *Manville,* 896 F.2d at 1390.  Where the case is initially brought

in a proper venue, the debtor's choice of forum is entitled to great weight.  *In re Enron Corp.*,

274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002).  Finally, if transfer of venue would merely shift the

inconvenience from one party to another, the debtor's choice of forum should not be disturbed.

*Id.* at 342-43 (citing *In re Garden Manor Assocs., L.P.*, 99 B.R. 551, 555 (Bankr. S.D.N.Y.

1988)).

### 1.    The Applicability of 28 U.S.C. § 1412

The Debtor first argues that § 1412 does not apply to chapter 15 cases.  Section 1410 of

title 28, quoted *supra*, provides a hierarchy of venue choices in a chapter 15 case.  If the debtor

does not have its principal United States place of business or principal United States assets in a

district, and there is no pending action or proceeding against the debtor in a district, then – and

only then – can the debtor select a venue that is "consistent with the interests of justice and the

convenience of the parties, having due regard to the relief sought by the foreign representative."

28 U.S.C. § 1410(3).  The Debtor maintains that allowing the Court to consider the interests of

justice or the convenience of the parties on a motion to change venue upsets the hierarchy

created by § 1410, and renders superfluous the direction to consider "the relief sought by the

foreign representative," a requirement under § 1410(3) but not under § 1412.

The present version of § 1410 was added by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005, Pub. L. No. 109-8, § 802(c)(4), 119 Stat. 23, 146 (2005), as

part of the same legislation that enacted chapter 15. *Id.* at § 801, 119 Stat. at 134-145. The prior version of § 1410 that applied to ancillary proceedings under repealed Bankruptcy Code § 304 did not include a provision permitting venue based upon interests of justice or the convenience of the parties. A court could, however, transfer the venue of a § 304 case pursuant to 11 U.S.C. § 1412. *See In re Emerson Radio Corp.*, 52 F.3d 50, 55 (3d Cir. 1995). When Congress repealed § 304 and adopted chapter 15 and the current version of § 1410, it did not amend § 1412.

The Court concludes that 28 U.S.C. § 1412 and Federal Bankruptcy Rule 1014(a)(1) permit a Bankruptcy Court to transfer the venue of a properly venued chapter 15 case. First, § 1412 applies to a "case . . . under title 11," and filing a petition for recognition commences a case under chapter 15 of title 11. *See* 11 U.S.C. § 1504. Hence, the express terms of § 1412 authorize the transfer. *Accord* FED. R. BANKR. P. 1014(a)(1). Second, §§ 1412 and 1410 are not inconsistent and can be read in harmony. The foreign representative gets the first crack at selecting venue. His selection, whether based on the location of the debtor's assets, place of business, pending litigation or the foreign representative's own notions of interests and convenience should not prevent a party-in-interest from seeking to transfer the venue of the case to another venue where the interest of justice or the convenience of the parties dictates that the transfer is appropriate. 1 COLLIER ¶ 4.04[5], at 4-29 to 4-30 ("If a party in interest contends that a chapter 15 case has been filed in an improper venue or, even if in a proper venue, that venue should be changed, there seems no reason why a motion to change venue would not be proper. Any such motion would be determined pursuant to section 1412.").

Third, § 1412 does not eviscerate the language of § 1410(c), or preclude a court from "having regard to the relief sought by the foreign representative" when considering the interest of justice or the convenience of the parties. As discussed below, a chapter 15 case unfolds far

33

differently than a plenary chapter 11 case. There are few proceedings; the assets and claims are

administered in the foreign proceeding by the foreign court. A Bankruptcy Court should

consider the nature of the case and what it will entail, including the relief sought by the foreign

representative, when contemplating the interests of justice or the convenience of the parties.

### 2.    Interests of Justice

The interests of justice and the convenience of the parties are written in the disjunctive,

and considered separately. The "interest of justice" is a "broad and flexible standard" that must

be applied on a case by case basis. *Manville*, 896 F.2d at 1391. When determining where the

interest of justice would be best served, courts may consider whether:

> (i) transfer would promote the economic and efficient administration of the
> bankruptcy estate; (ii) the interests of judicial economy would be served by the
> transfer; (iii) the parties would be able to receive a fair trial in each of the possible
> venues; (iv) either forum has an interest in having the controversy decided within
> its borders; (v) the enforceability of any judgment would be affected by the
> transfer; and (vi) the plaintiff's original choice of forum should be disturbed.

*In re Dunmore Homes*, 380 B.R. 663, 671-72 (Bankr. S.D.N.Y. 2008). The most important

factor is the first: the economic and efficient administration of the estate. *See Landmark Capital*

*Co. v. N. Cent. Dev. Co.* (*In re Landmark Capital Co.*), 20 B.R. 220, 224 (S.D.N.Y. 1982).

When it is alleged that a debtor has manipulated venue, courts will consider the debtor's

purposeful acts to manufacture technical compliance with the venue statute. *See, e.g., Patriot*

*Coal Corp.*, 482 B.R. at 743.

Relying primarily on *Patriot Coal* and *Dunmore Homes*, Solyndra argues that the Debtor

manipulated venue by establishing the BONY account in New York, an account that had no

legitimate purpose. (*See Solyndra Venue* at ¶ 49.) In addition, the efficient and economic

administration of the estate would be served by transferring venue to the Northern District of

California because the Debtor obtained post-petition financing from Suntech America, which is located in San Francisco as is the office of the Debtor's General Counsel. (*Id.* at ¶ 51.) Finally, the Northern District of California has the greater interest in the chapter 15 petition and its recognition because Solyndra may be the largest creditor if it succeeds in its antitrust lawsuit. (*Id.* at ¶ 53.)

For reasons already discussed, the JPLs did not manipulate venue or establish the BONY account for an improper business purpose. Furthermore, Solyndra's position is based on the incorrect view that Debtor does business in the Northern District of California, and the establishment of the BONY account deprived the case of a proper California venue.

Solyndra's arguments regarding efficiency and economy are also misplaced. The Debtor borrowed money from Suntech America in the Foreign Proceeding and not in any case pending in this Court. The parties stipulated to Cayman Islands governing law, (PX 18 at ¶ 15(a)), submitted to the exclusive jurisdiction of the Cayman Islands courts on all matters relating to the loan agreement, (*id.* at ¶ 15(b)), and the loan agreement was approved by the Cayman Court on January 31, 2014. (PX 52.) The loan was not part of any financing approved by this Court, there will not be any proceedings in this Court regarding that loan, and any dispute arising out of the loan agreement will be resolved by the Cayman Court. In addition, Mr. Liou, the Debtor's former General Counsel, resigned in May 2014, and there is no evidence that the Debtor even has a General Counsel. Moreover, the JPLs, who run the Debtor, have retained lawyers located in New York and the Cayman Islands.

Finally, this district has the greater interest in the chapter 15 proceedings. The Debtor is currently the subject of the Involuntary Case in this Court. The RSA temporarily halted the

Involuntary Case, but the Petitioning Creditors recently advised the Court that the RSA has terminated, and requested the entry of an order for relief.  *See* fn. 9, *supra*.  The pending Involuntary Case is intertwined with the chapter 15 case, and the administration of the two cases overlaps.  First, so long as the Involuntary Case remains pending, any party seeking relief from the stay will have to move in both the Involuntary Case and in the chapter 15 case because recognition as a foreign main proceeding also triggers the automatic stay with respect to the debtor and property of the debtor within the territorial jurisdiction of the United States.  *See* 11 U.S.C. § 1520(a)(1).  It is more efficient for the same movant to file both motions in the same court to be heard by the same judge at the same time.  Second, the parties have already created an extensive record on the pending motions that is also relevant in deciding whether the Debtor was eligible to be a debtor in the Involuntary Case and whether venue was proper at the time the Involuntary Case was commenced.  Third, the JPLs may argue that the Court should dismiss or suspend the Involuntary Case pursuant to 11 U.S.C. § 305 based on the pendency of the Foreign Proceeding and the chapter 15.  *See In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 441 (Bankr. S.D.N.Y. 2007) (dismissing involuntary case under 11 U.S.C. § 305 in deference to pending foreign proceeding).

The Northern District of California, on the other hand, does not have a significant interest in the chapter 15 case.  The pendency of the California litigation has little impact on the chapter 15 proceeding.  The litigation was stayed as against the Debtor by the filing of the Involuntary Case, and will remain stayed whether or not the Court grants recognition or transfers venue to the Northern District of California.  Even if the stay is lifted for the purpose of liquidating the claim and Solyndra recovers a judgment, it must still seek payment of its judgment in the

Foreign Proceeding.  And as Solyndra argues, the Debtor does not have any assets in the United States to which it could look to satisfy a judgment.

### 3.        Convenience of the Parties

Convenience of the parties generally involves consideration of the location of the parties and their counsel, the location of the proof, and the ability to compel otherwise unwilling witnesses to testify.  *Official Committee of Unsecured Creditors v. McConnell* (*In re Grumman Olson Indus., Inc.*), 329 B.R. 411, 435 (Bankr. S.D.N.Y. 2005).  Unlike § 1404(a), the convenience of the witnesses does not have to be taken into account under § 1412, although it is part of any discussion to change venue.  1 COLLIER ¶ 4.05[3][a], at 4–33.  In a chapter 15 case like this one, any inconvenience to the parties will be minimal regardless of where it ends up.  The Court acts in aid of the Cayman Court where claims will be proved and paid, disputes will be heard, and a scheme of arrangement may be sanctioned.  The Debtor owns no property in the United States other than the BONY account, and does not conduct any business that might give rise to a need for judicial intervention.

The Court foresees few proceedings in the chapter 15 case after recognition is granted.  The Debtor is the subject of several lawsuits pending in California and elsewhere, but these suits have been stayed since the filing of the Involuntary Case, and no party, including Solyndra, has sought relief from the automatic stay to prosecute their claims.  Aside from the possible stay relief motions, if the Cayman Islands court sanctions a scheme, the JPLs will seek an order enforcing the scheme within the territorial jurisdiction of the United States.

The Southern District of New York is equally convenient if not more convenient to the parties to those proceedings.  The applications described, including possible motions for stay

37

relief, raise primarily legal questions that do not involve witnesses or proof of contested facts.

The parties that have participated in the chapter 15 case already employ New York counsel.

Furthermore, while Solyndra points out that five of the six creditors that signed the RSA reside

substantially closer to California than New York, (*Solyndra Venue* at ¶ 59), those creditors opted

for a New York venue when they signed the RSA and are the best judges of their own

convenience.  Finally, Solyndra's predecessor in interest filed its own chapter 11 case in

Delaware, (PX 13), rejecting a "more convenient" venue nearer its world headquarters in

Fremont, California.  (PX 14 at ¶ 4.)  On balance, the Court concludes that the relevant factors do

not weigh in favor of transferring venue to the Northern District of California, and Solyndra's

cross-motion is denied.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to

Rule 52(a)(1) of the Federal Rules of Civil Procedure made applicable to this contested chapter

15 petition by Rules 7052 and 1018 of the Federal Rules of Bankruptcy Procedure.

Settle order on notice.

Dated: New York, New York
       November 17, 2014

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge